639 F.2d 72
 In the Matter of the Complaint of PACIFIC BULK CARRIERS,
INC. as Owner of the
M.V. Atlantic Hope for the Exoneration from or Limitation of
Liability. PACIFIC BULK CARRIERS, INC.,
Plaintiff-Third-Party-Plaintiff-
Appellant-Cross- Appellee,
v.
M.V. SADOHARU MARU and Yamashita Shinnihon Kisen, K.K.,
Third-Party- Defendant-Appellee,
and
United States Lines, Inc., as Owner of S.S. American
Aquarius and United States Lines, Inc.,
Claimant-Appellee-Cross-Appellant.
 Nos. 548, 1666, Dockets 79-7534, 79-7573.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 7, 1980.
Decided Sept. 16, 1980.
 
 Richard H. Brown, Jr., New York City (Kirlin, Campbell & Keating, Harry A. Gotimer, New York City, of counsel), for United States Lines, Inc.
 David C. Wood, New York City (Burke & Burke, New York City, of counsel), for Pacific Bulk Carriers, Inc.
 John C. Koster, New York City (Healy & Baillie, Allan A. Baillie, New York City, of counsel), for Yamashita Shinnihon Kisen, K.K.
 Before MOORE, FRIENDLY and MESKILL, Circuit Judges.
 MOORE, Circuit Judge:
 
 
 1
 This litigation arises from the collision of two ships, the M.V. Atlantic Hope (Hope) and the S.S. American Aquarius (Aquarius), in international waters south of Japan early in the morning of April 20, 1973. The trial court (Honorable Charles E. Stewart, Judge, Southern District of New York), based on findings of fact, held Pacific Bulk Carriers, Inc., as owner of the Hope, 80% liable for the collision and United States Lines, Inc., as owner of the Aquarius, 20% liable. Yamashita Shinnihon Kisen, K.K., as owner of the M.V. Sadoharu Maru (Maru), another ship which had crossed between the ships before they collided, was held not liable. Hope and Aquarius both appeal from the judgment below.
 
 
 2
 The only issue before the trial court was the responsibility of the parties for the damages resulting from the collision, all other claims having been settled. On appeal the primary issue is the trial court's apportionment of fault: 80% attributable to the Hope; 20% to the Aquarius. From the facts as found by the trial court we believe that the Hope is 100% liable and that the Aquarius should be exonerated. To this extent we modify the decision below.
 
 
 3
 The lower court has adequately outlined the facts in its opinion, 493 F.Supp. 192, and we sketch only an outline of the events which occurred in the early morning hours on April 20, 1973. At approximately 3:20 a. m. the weather was dark and overcast with light rain, but visibility was good at six-eight miles. Two ships, the Hope and Maru, were headed in a southwesterly direction. Aquarius was traveling in a southeasterly direction so as to cross in front of Hope and Maru. Before the collision, Maru had passed Hope to Maru's starboard, then turned to starboard some 3/4 mile ahead of Hope to cross between Hope and Aquarius. As the privileged ship (to Hope's starboard) in a crossing situation under the International Rules[1] (33 U.S.C. § 1081, Rule 19[2]), Aquarius kept its speed up until immediately before the collision. Hope, the burdened ship under Rule 19, was required to keep out of Aquarius' way, but it also kept up its speed. Hope turned hard to port immediately before the collision, and struck Aquarius aft on the port side. The court found that a turn hard to starboard at the last moment would have avoided the collision.
 
 
 4
 We affirm the judgment of the district court insofar as it exonerates the Maru and holds Hope liable. The trial court found that the Maru was some 3/4 mile in front of Hope when it crossed between the two ships, and that "when Maru turned to cross Hope, she was past and clear and there was no danger of collision". 493 F.Supp. 192. She was properly exonerated.
 
 
 5
 The evidence of Hope's negligence was overwhelming. She failed to keep an adequate lookout as required (Rule 29[3]); she failed to sound two blasts when turning to port (Rule 28(a)[4]); she failed to use her radar; the Master was below and not on the bridge although he knew they were navigating in a heavily traveled area; and the ship went hard to port immediately before the collision, when a turn hard to starboard might have avoided the collision. We agree with the other findings of fact set out in the district court opinion which bespeak Hope's fault in this collision. 493 F.Supp. 192.
 
 
 6
 The question of Aquarius' liability arises out of the effect, if any, to be given to a traffic separation scheme (TSS) designed by the Japan Captain's Association, a non-governmental, unofficial body. In this area of heavy ocean traffic, the scheme provides separate lanes for traffic in opposite directions, the lanes being separated by a buffer zone. Each lane is one-and-a-half miles wide and the buffer zone one mile wide. The TSS involved in this case, known as the Shiono Misaki, as found by the court, had not been submitted to, or approved by, the Intergovernmental Maritime Consultative Organization (IMCO), "the only organization empowered to recommend traffic separation lanes in international waters". 493 F.Supp. 192.
 
 
 7
 The district court found that: "As to the Aquarius, she clearly was proceeding in the wrong direction in the westbound lane of the Shiono Misaki TSS". 493 F.Supp. 192. This fact, however, is not determinative of Aquarius' liability because Aquarius and Hope had sighted each other at some distance. Visibility was six-eight miles and regardless of any TSS "it is clear that the applicable International Rules controlled once Aquarius had sighted Hope and Maru." 493 F.Supp. 192. Under these rules, Aquarius was the privileged vessel and it was the duty of the Hope to keep out of her way and to take whatever affirmative action was necessary to do so. This the Hope failed to do.
 
 
 8
 In assessing 20% liability against the Aquarius, the trial court relied greatly on a recent English admiralty case, The Genimar, (1977) 2 Lloyd's Rep. 17. The factual situation there was somewhat different. Unlike the setting in The Genimar, the TSS in this case was not marked on the official government navigation charts for the area. Three of the four ships in the area of this collision were not complying with the lanes. Hope knew she was the burdened ship here, and had at least six miles of open water with good visibility in which to maneuver. Under these circumstances had the Hope followed the applicable International Rules, the collision could have been avoided.
 
 
 9
 Defining good seamanship as requiring "compliance by the vessel with a collision-preventing scheme of which her master ha(s) full knowledge", 493 F.Supp. 192, the trial court faulted the Aquarius to the extent of 20% for the decision of its master to set an eastbound course across the westbound traffic lane of the TSS. With this definition and the consequent finding of poor seamanship we do not agree. As noted above, the traffic separation scheme in question had not been approved by IMCO. Granting that some sailing rules not having official status can achieve the force of law by custom or usage, the trial court found correctly, in our view that the Shiono Misaki TSS had not attained the status of a custom. We decline further to extend the net of liability. Mere knowledge of the existence of a traffic separation scheme lacking the force of law does not create an enforceable duty to observe it. Thus, the action of the Aquarius in our opinion cannot be fairly characterized as a failure to conform with good seamanship.
 
 
 10
 However, even if we were to find that the Aquarius was bound to follow the TSS, our disposition of this appeal would not be altered. The vessels were in international waters. The Aquarius was entitled to proceed in accordance with, and to rely on, the standard rules applicable to international waters. The Hope had at least six miles of open water in which to maneuver so as to avoid the Aquarius. The vessels remained within sight of each other during this distance. Each vessel knew of the presence of the other and its maritime obligations. Under these circumstances the TSS, even if elevated in status, would not supersede applicable Rule 19. The fact that the Aquarius was in the "wrong" lane according to the TSS did not justify the Hope in disregarding international rules. The collision was caused by such disregard and any fault attributable to the Aquarius was not a factor.
 
 
 11
 Even in The Genimar the court said: "There may well be cases of collisions in clear weather, where contravention of a traffic separation scheme by one of the colliding ships, though a fault, will nevertheless not be a causative fault. A typical case of that kind would be where, although the area is usually busy, no ships other than the colliding ships are about at the time, and they see one another clearly at a distance of several miles", (1977) 2 Lloyd's Rep. at 26. Although in this case there were other vessels in the vicinity the trial court found they did not affect the navigation of either the Hope or the Aquarius. These two ships, the only vessels involved in this collision, were aware of each other for many miles and knew of their respective obligations.
 
 
 12
 We modify the judgment of the district court insofar as it holds Aquarius 20% liable for this collision, and direct that judgment be entered exonerating Aquarius and holding Hope solely at fault.
 
 
 
 [1]
 The International Regulations for Preventing Collisions at Sea ("International Rules") in effect at the time of the collision in 1973 were at 33 U.S.C. §§ 1051 to 1094 and in particular 33 U.S.C. §§ 1078, 1081, 1083-6, 1089-91. The Regulations, as revised in 1977, are now at 33 U.S.C. foll. § 1602
 
 
 [2]
 Rule 19 (33 U.S.C. § 1081) states:
 "When two power-driven vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."
 Rule 22 (33 U.S.C. § 1084) describes what the burdened vessel is required to do:
 "Every vessel which is directed by sections 1078-1089 of this title to keep out of the way of another vessel shall, so far as possible, take positive early action to comply with this obligation, and shall, if the circumstances of the case admit, avoid crossing ahead of the other."
 Rule 21 (33 U.S.C. § 1083) describes the obligation of the privileged vessel:
 "Where by any of sections 1078-1089 of this title one of two vessels is to keep out of the way, the other shall keep her course and speed. When, from any cause, the latter vessel finds herself so close that collision cannot be avoided by the action of the giving-way vessel alone, she also shall take such action as will best aid to avert collision (see sections 1089 and 1091 of this title)."
 
 
 [3]
 Rule 29 (33 U.S.C. § 1091) states:
 "Nothing in sections 1061-1094 of this title shall exonerate any vessel, or the owner, master or crew thereof, from the consequences of any neglect to keep a proper look-out, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."
 
 
 [4]
 Rule 28 (33 U.S.C. § 1090) states:
 "(a) Meaning of blasts
 When vessels are in sight of one another, a power-driven vessel under way, in taking any course authorized or required by sections 1061-1094 of this title, shall indicate that course by the following signals on her whistle, namely ...
 Two short blasts to mean 'I am altering my course to port.' "